EDNA EDITH BATISTA PAGÁN ET AL., represented by JUAN BATISTA, Plaintiffs, Appellees, Appellants, *v.* DR. M. JULIÁ HOSPITAL, INC., and AMERICAN SURETY COMPANY, Defendants, Appellants, Appellees.

No. 10164. Argued May 11, 1950.—Decided November 9, 1950.

*F. Prieto Azúar* for defendants, appellees, appellants. *Bolívar Pagán* for plaintiffs, appellants, appellees.

MR. JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

In the morning of April 3, 1948, Pablo Batista, 44 years old, was hospitalized in the Juliá Hospital Inc.—a private institution devoted to the hospitalization and treatment of mental patients. When admitted to the hospital he was assigned to Ward B, which consists of five rooms. There were 21 patients in it. He was confined in room No. 1 together with three other patients. The entrance to the room had no door, so that the patients could be more easily observed from the hallway and the room had only five beds with sheets and mosquito nets. The windows had iron bars and a thick screen wire on the outside. Ward B patients were under the immediate supervision of two orderlies whose duties were to watch them and to attend to their needs. On the evening of April 5, the orderlies put Batista to bed and left the room. When they returned a short time later, they found him hanging from one of the window bars with the sheet of his bed around his neck. He was still alive but he died shortly thereafter of asphyxia by strangulation.

Batista's heirs—his minor children, Edna Edith, Rafael, Juan Bautista and José León Batista Pagán—brought a civil action against the said hospital and its insurer, American Surety Company, to recover damages for their father's death. They obtained judgment in the sum of $20,000 plus the costs and $2,000 for attorney's fees.

The plaintiffs as well as the defendants appealed to this Court. The former sustain that the award granted is insufficient and that the lower court erred in not including any amount for the loss of companionship and society of their father. The latter sustain that it erred (1) in admitting the testimony of a witness for the plaintiffs on an alleged admission of negligence of an employee of the defendant hospital; (2) in granting an arbitrary and excessive compensation and in granting excessive attorney's fees; and (3) in deciding that the defendant hospital was negligent and that this was the proximate cause of Batista's death, notwithstanding that the plaintiffs' evidence showed that his death was truly inevitable.

■ Let us first consider the third error assigned by defendants. They deny liability for Batista's death. Their theory is based on the fact that the orderlies in charge of patients in Ward B were absent from Batista's room for 2 or 3 minutes only and that this does not constitute sufficient negligence to make them liable for his death. Let us see.

The plaintiffs' evidence was to the effect that Batista was brought from Guayanilla on April 3, 1948, at six o'clock in the morning and was confined in the hospital on Dr. Mattei's recommendation. They left the town of Guayanilla at six in the afternoon of the preceding day, having so delayed because of Batista's state of excitement during the trip, constantly struggling with his own father, who accompanied him in the back seat of the car which was driven by Batista's brother. When they arrived at the hospital, Batista took off his clothes in front of the building. During the last six months before entering the hospital, Batista had expressed his desire to cut his children's throat and to kill himself. He was suffering from testiary syphilis for which he had been previously treated. When he entered the hospital, Juan, his brother, deposited the sum of two hundred and sixty-eight dollars. He informed the doctor who took down the patient's case history as well as the manager of the hospital of Ba-

tista's homicidal and suicidal tendencies. On the evening of the 5th he was found hanging from the window bars, with his bed sheet tied around his neck. The orderlies had left him lying down shortly before he was found; they had left his room in order to take care of other patients in Ward B.

The defendants' evidence was to the effect that when Batista entered the hospital neither the doctors nor the employees were informed that he had suicidal tendencies and that on the evening of his death the orderlies in charge of the ward left Batista alone for only 2 or 3 minutes while they took care of other patients in the same ward, suicide being inevitable, since the hospital could not reasonably expect that such an unfortunate event would happen in such a short period of time as they had not been warned about the suicidal tendencies of the patient.

The decision of the lower court concerning the liability of the clinic is in our opinion supported by the evidence offered. Although said court did not believe it necessary to express any conclusion as to whether the defendant was informed or not about Batista's suicidal tendencies, such conclusion in the affirmative was truly unavoidable considering his previous behavior, according to the testimony of his brother Juan. Nevertheless, the attendant circumstances in this case justify the conclusion that the lack of such warning could not defeat the plaintiffs' claim since it was the duty of the hospital itself to determine the patient's condition and give him due attention in order to protect him. It appears from the records that because of Batista's state of excitement he was not submitted to the usual examination of admission. This omission clearly shows the lack of diligence of the hospital to determine to what degree Batista needed constant attention and vigilance and what treatment should be given him. By such omission the hospital assumed a risk in putting Batista near the other patients who did not need constant attention or vigilance. We need not determine whether the

orderlies were out of the patient's room for 2 or 3 minutes—as the defendant maintains. The essential fact is that they were out of Batista's room for a sufficient length of time to permit him to get up, tie the sheet around his neck and around one of the bars, and hang himself in such a way that the weight of his own body would produce on him the degree of strangulation and asphyxia which caused his death shortly after he was found still alive.

The lower court did not believe the evidence to the effect that the orderlies were absent from Batista's room for 2 or 3 minutes. There is medical evidence in the record which reasonably leads to the conclusion that besides the time needed for preparing the means of his death, Batista had to be hanging for a length of time greater than 2 or 3 minutes in order to suffer such a degree of strangulation and asphyxia as to cause his death. Under these circumstances the plaintiffs' evidence establish prima facie negligence on the part of defendant. In the opinion of the lower court it was not overcome by defendants' evidence.[1] We find no reason to interfere with such conclusion. In our opinion the error assigned does not exist.

■ The first error is likewise without merit. The lower court admitted the testimony of Antonio Peña, an employee of plaintiffs' attorney, to the effect that one of the orderlies, Rafael Cruz Ildefonso, who was called as a witness for the plaintiffs and who testified that he had been absent from Batista's room for only 2 or 3 minutes—in a conversation with Peña when the latter delivered him a summons, admitted to him that he was absent from Batista's room for about half an hour. The defendants impeach the admission of this testimony because it was not part of the *res gestae* and it was

---

[1] If, as pointed out by the lower court, the bars of the window from which Batista hung himself had been outside of the room or at least outside the screen which covered them, Batista could hardly have accomplished his death as there were no tools of any kind in the room with which to cut the screen.

hearsay. We would agree with defendants if said testimony had been admitted without any reserve. But the truth is that the lower court in admitting it, categorically stated that it did so for the sole purpose of impeaching the credibility of witness Cruz Ildefonso who also testified as witness for defendants. The error assigned, therefore, does not exist.

■ In the other error assigned defendants assail the award of compensation as well as the attorney's fees because they are excessive. As to the compensation, it is true that the evidence showed that during the last two years Batista underwent periodical treatment for syphilis and that in the last six months he suffered not only the first stages of paralysis which caused him to drag his leg but also mental derangement. Nevertheless, Dr. Mattei's medical testimony was uncontradicted to the effect that with adequate treatment he could have returned to society to lead a normal life. This being so and it appearing from the evidence in the record that prior to the critical condition of the last six months—before entering the hospital—Batista was operating a farm which produced from two to three thousand dollars annually, it is evident that plaintiffs suffered a financial loss because of their father's death. In fixing the sum, the lower court considered that there were four minor plaintiffs, 11, 10, 9 and 8 years old, that their father was 44 years old and the fact that they were left orphans and helpless because of their father's death, besides other factors which we shall mention hereinafter as well as the low purchasing power of the dollar. Under those conditions we believe that we should not disturb the discretion of the lower court in this respect. And since the sum granted for attorney's fees is not excessive, we shall not alter it on appeal.

The foregoing statement to the effect that the amount of the award is not excessive disposes of the first error assigned by plaintiffs that the compensation is low. Consequently, we shall not consider it any further.

776

The plaintiffs also assign a second error to the effect that the compensation granted by the lower court does not include any amount for the loss of companionship and society of the plaintiffs' father. They are mistaken. Although in the dispositive part of the opinion of the lower court in fixing the compensation it only mentioned "the loss of help, protection, support and mental anguish suffered by the latter [the plaintiffs] as a result of their father's death", it is also true that the language used immediately preceding those words—although it does not use the phrase "loss of the companionship and society"—amounts to the same. The court said:

"In fixing such sum we have done so after having carefully and fairly considered all the facts and circumstances of the case, paying due attention to the tender age of the plaintiffs. The oldest one is 11 years of age and the others 10, 9 and 8, who having lost their mother prior to these events have been left orphan and helpless in life . . ."

The judgment will be affirmed.